Morning, Your Honor. Land Weyland for the appellate petitioner in this matter. The immigration judge made three significant errors in this case. First, she improperly refused to admit numerous relevant documents and then complained about a lack of corroboration. Secondly, she claimed that the petitioner was not credible because she had memorized a two-page written statement and could not deviate from that statement when in fact over 75% of her testimony dealt with issues and facts that were not covered in the statement at all. Well, I was amused by that because usually we find the complaint that they're testifying to all sorts of things that weren't in their asylum application. And here, they're complaining because she was testifying to what was in her application. Well, when the application was filed, she had not gone to church at once at all. And in her application, she said she was not a religious person. After the interview with the asylum office, she began to go to church and about six months later, five months later, she was baptized. The decision was then made about a year after that. The judge got that to church after the asylum case was decided. And it's the other way around by a long shot. But there was no way for her to have a problem with deviation from a statement discussing religion because the statement never covered religion, that this was all an after fact. And yet the judge felt very strongly that she had memorized her statement, she was regurgitating her statement, when in fact, 75% of the questions had nothing to do with the statement whatsoever. So the judge on that particular point was just completely wrong. And if that was one of her main reasons for finding that the witness was not credible, the judge was the one who was wrong. The third reason that the judge, I think, made a mistake is that she engaged in impermissible speculation about the reason that the petitioner went through a religious conversion. The judge seemed to feel that she had had her interview and all of a sudden realized that she needed to find something else to do, so she started going to church. But the decision had already been made, and so she was looking for this for something later. And the judge simply got the sequence of events wrong by more than a year. And I think it's also, the judge also did not listen to her statements about why she went to church. The judge had her going to church for five months at one point before she became baptized, three months at one point, and one month at one point. The judge wasn't even listening to her own testimony. Her opinion ran 31 pages. She covered each of these points four or five times. As you read through this, you see that she kept giving different reasons, different reasons, different reasons. It sounds like she was, the way I understand these are put together, they don't have the transcript. It sounded like she was reading from notes that she'd taken, sort of reading through, sort of, the sequence of testimony. That's correct. And what had happened was that the bulk of the testimony had been taken in September. It came upon the noon hour. The judge said, I have a priority case this afternoon. I can't continue this case. I'll have to continue it over for about four or five months. When she came back, apparently she did not know what her notes meant because she made references. For example, at one point she made a reference to the fact that the witness had said she'd read the Bible and could not cite her favorite portion of the Bible. In fact, as I pointed out in my brief, the testimony was the district counsel asked her, what's your favorite portion of the Bible? She said, may I tell you the Lord's Prayer? He said, no. Is that your favorite portion? She said, yes. And yet in the oral decision, the judge says she couldn't say what her favorite portion of the Bible was. The judge was wrong on that. I think she misunderstood what her notes meant. I think she put down maybe something like favorite portion, the Lord's Prayer, and that's all she talked about. Could I ask you a question about the authentication issue? I'm a little confused a bit by the record in any event. At the first hearing, the IJ calls into question these various documents, the notary stamp and a variety of other things. And she says, OK, I want you during the interval to go off and at least get some of these documents authenticated. Yes. Could you clarify then what did or didn't happen and what the problems are? I see the why or how or how you can't get documents authenticated when they emanate from China. Authentication is something that clearly had this judge confused and she said she didn't know how the process worked. Authentication means one thing only. It means that the embassy is authenticating the signature of a senior official at the Chinese Foreign Affairs Ministry and saying that is his signature. Now, that is supposed to be attached then to a document that says that this person has in fact authenticated something below that and it goes all the way back down to whatever the original base document is. But authentication is only authentication of a signature. It has nothing to do with the contents of the document. And what you do and it is only for official government signatures on official government documents. And what you do is you send the document to the embassy. They have exemplars of signatures on cards on hand. They will say, yes, this looks like it is the signature of this particular person. And they send that back. And that's all authentication is. But that wasn't done. That was not done because because it only applies to official government documents. You had some when the subpoena and official there were there was a summons that was that was that was involved. But the original summons was provided and you don't need to authenticate original documents. So so they don't know that the embassy function isn't to validate that the document that they're authenticating is indeed an official document as well as that would be content. But just that it is an official that that would be if the INS wanted to do a field investigation and have it sent over, they have a field investigation office at the embassy that does fraudulent documents or investigations. But that's not authentication. And the judge seemed to feel that that's what was going on here. And so authentication never applies to private documents. So, for example, the judge wanted to have the certificate, the abortion certificate from the hospital authenticated. That could not be done. She wanted to have the letters from the husband and daughter authenticated. That could not be done. The judge misunderstood the entire authentication function. And yet that was one of the main reasons she gave for not admitting any of these documents. And I think that that that was that was serious here. Furthermore, under the rules of this court, documents don't have to be authenticated to be considered. And if the judge wants to say she has to at least consider them, she can say, I find they're not credible. The judge never did that. The judge made no credibility finding regarding these documents. And the law in this court is that if the court is going to make credibility finding regarding documents, it has to go through the same cogent analysis of why this document is not credible. She did not do that. And some of these documents were clearly very important in this case, because if the judge had done an analysis, found that some of the documents were credible, I think they would have made a decision deciding that she had had an abortion. The judge, by the way, seemed to agree that she did have an abortion. The judge's only problem was that she found that and she made no claims regarding credibility on abortion. She didn't discuss that issue at all. She just simply said it just did not discuss her credibility on abortion at all. What she did say was because I find that she's not credible in other areas, I therefore find that she's not credible regarding the abortion. But the only problem with the abortion issue that she saw was she agreed that she'd had the abortion, but she said, I'm not sure the abortion was coerced because she was able to keep working and she got paid. But that one has nothing to do with the other. And so the judge's reasoning on the abortion issue simply is not supported by anything in this record. She also made mention that I'm curious, because I've never seen this before, that she was a communist and that seemed to be a factor. Is that something that is considered in the way is an active communist official, high level official and comes to the United States? Is it improper to, I'm not saying she was, but is it improper to take that into account as part of the asylum? I think it's highly improper. And besides, she wasn't a high level official. She worked in her business. She was the trade representative. In other words, she was like the union rep in the company. And to be there in that position, she had to be a member of the Communist Party. So I'm not sure it's a high level position. But as far as the fact that the judge said she has not disavowed that, I have no, I've never encountered anything like that. I've been doing this for 32 years. I've never seen anything like that. And but the judge seemed to feel that that was important. And it was not discussed, there was no testimony regarding that at all. The judge never asked any questions. And I am now, one second over, thank you. May it please the court, John Unshine on behalf of the United States Attorney General. Your honors, the substantial evidence supports the agency's finding in this case. And the court may very well find that in some of these findings here that a reasonable adjudicator might have been compelled to find otherwise. However, this court has held in Wang v. INS that so long as one of the identified grounds is supported by substantial evidence and goes to the heart of the claim, this court is bound to accept the IJ's adverse credibility finding. And that one ground that I'm pointing to is the Christian pamphlet mailings that she testified to, to China. And specifically, the judge noted issue with this finding when she testified that she made it a habitual practice to put her name and date on the pamphlets, religious pamphlets that she received. She gave an explanation why she didn't in the case of the brochure saying it was full, no room. She gave one, whether it's. That's right, your honor. She did give that explanation. But backing up a little bit, the judge had a problem with the fact that that sequence of questioning began when she said that she mailed these pamphlets, booklets and magazines to her husband. The judge then said, asked her, how is it possible that the police found out about it if you mailed it to your husband? She then replied that, well, I asked him to send it to a friend of mine that she wanted to get it to. To that, the judge notes also in her decision that she found this woman to be intelligent and didn't believe that she would ask her husband to give these brochures to another individual and put him at risk of these things being discovered. Of course, she did respond to that question. The judge did not find that plausible because then thereafter, she mentions the fact that she puts her name on the document. And of course, the issue came up as to how is it that it was traced back to you? The judge didn't find it plausible that she would put her maiden name on there. And then ultimately, and she said that her maiden name was not an uncommon one in that area. And that ultimately, that somehow led to it going back to her husband. It's not really explained as to how. And beyond that, the notation evidence came out. And at that point, Mrs. Gee had a pamphlet with her. And that's when the fact that this pamphlet didn't have it on there came up and the judge confronted her with it. She did give her the response that, well, there's no room to write it on this one. Counsel, let's for the moment put aside the Christianity and the religion. Let's say that the judge disbelieved that, couldn't disbelieve it. But if, in fact, the abortion claim was sustainable, the other one wouldn't matter. Isn't that correct? Well, I think it would matter in the respect that the credibility finding that went to the totality of the claim itself. I don't know if you could sever one from the other and say this part of the claim was not credible, but this part was. Well, I think you can. Now, I'm not saying that we disbelieve her on the Christianity one way or the other, but the statute is very clear that if you have been forced to have an abortion, which you didn't want to have, that you're entitled to asylum in this country. Isn't that correct? That's right, Your Honor. And in this case, the immigration judge didn't make that finding, of course. And if the court does believe that the immigration judge, a reasonable judge, would have been compelled to find otherwise, it would have to be remanded back to make those kinds of findings on the merits. But specifically, it appears in this case, though, the judge colored the whole claim. Well, she said several reasons that involved not only the religious issue, but the whole claim she found to be incredible. But yes, as to whether or not she can establish a claim specifically on one ground, she certainly can do that. And the agency would have to make that determination in the first instance. You say that we would have to remand. I think the statute is absolute and clear that if it were established that she'd had a forced abortion, that is deemed under the statute. It's an odd statute. It's the only one that does this. It's deemed to be persecution and the individual's entitled to asylum. Yes, Your Honor, but the statute states specifically that the individual would have to be, is forced to have an abortion. Well, I understand that. But if we were to find that that were the case, you were saying we'd have to send it back. I don't know why. Well, that's because the agency didn't find that to be the case in the first instance, because that would be a finding on the merits. And in this case, it didn't get to that. And that's why it would have to be remanded under Ventura. To go back to decide whether or not it was a forced as opposed to voluntary? That would be one of the issues that was litigated. That's correct, Your Honor. But he has testified that it was forced. And the reasons, whether we believe them or not, of the IJ, that there's evidence there that it was voluntary. I mean, if we decide that it was a forced abortion, that's the end of it in terms of that count, in terms of asylum, I would think. Well, asylum is also a matter or a form of relief that would have to be granted as a discretion. Oh, well, of course. But it's eligibility that we look at. Yes. If there was a finding in terms of eligibility, yes, that finding would then be on the record. But of course, the granting of relief would have to be sent back to the board in order to, yes. But we don't have to send it back to have the facts redetermined on whether there's eligibility. That's right, Your Honor. The court would have to, of course, remand and consistent with the findings of this court, then take the case at issue before it. And if there's no further questions on that issue, that one specific issue alone, and citing back to Wang again, this court would have to find that it was really a reasonable adjudicator would have to be compelled to believe the story that she portrayed with that specific issue. In terms of the documents, again, if the court finds that these documents, the judge erred and there wasn't substantial evidence to support, or actually the judge abused her discretion in not admitting these pieces of evidence, again, it would have to be remanded in order to make a determination on the record with the documents as they exist in the record as to whether or not Mrs. G merited asylum. Do you disagree with the, with respect to the documents as to what counsel portrayed as the status of these documents and whether or not they needed to be authenticated? Well, yes and no. Disagree with the, the government document that was brought up, the police summons, that certainly could have been authenticated. Whether or not it has to be, it doesn't have to be, but in this situation, the judge found that there was an issue with them because several of these documents had a notary stamp on them, including the originals, a notary stamp from someone commissioned in California. She apparently took issue with that. Didn't, didn't find that to be really something that was savory in her mind as terms of the credibility of these documents. And because of that, she suggested that these doc, that the documents, she said, pick some of them, I guess, in her mind, to, to make her feel more at ease with the credibility of these documents and to have them authenticated. And the judge does say she wasn't very familiar with the process, but knows that, that documents can be authenticated. And the reg does state that it's government documents that can be authenticated. And with respect to the police summons, the, the issue in that case, opposing counsel have mentioned that if there's an authentic copy or if there is no copy in the record, there's an original, it wouldn't have to be, but if that could still be authenticated, again, to authenticate the signature of the signing official of the Chinese government, whether or not it's a copy or not, what you're presenting is an original. That, of course, helps the credibility of that document. But on top of that, if it's an authentic. Is it required to be, if it's an, if it's an original, does it have to be authenticated? It doesn't, the authentication doesn't have to occur at all. No, it does not. But the judge found it necessary in this case in order to bolster the credibility in her mind of Mrs. G or Ms. G rather. Another thing I would note too, and the board addressed this and it doesn't really go to the merits, is that there was a, a motion to state proceedings filed in this case where the petitioner, or Ms. G, had filed an I-130 petition for her new spouse, apparently a U.S. citizen spouse, had filed a petition for an alien, or for an immediate spouse, rather, petition. And the board noted it and dismissed or denied the petition, the motion to state, because there was no clear and convincing evidence that this was a bona fide marriage. And we note in our brief that that somehow seems to cut against the issue of course, of family planning and fearing that when she is now married in this country, and, and previously her claim is that she fears going back in a, in continuing a relationship with her husband, which the communist government would, would want to hamper. The immigration, that of course was not before the immigration judge and the board noted it in a footnote in discussing it. Did you have a, moving on because of the time running out, do you dispute the conversion in relationship to when she knew that her asylum application that had been denied? Your Honor, frankly, the record seems to, to support what co-counsel has said. It appears the judge either believed the petition was denied earlier than it was, or if in fact there was a problem with it, her reason was it occurred after the interview, not the denial. And if... And if there are no further questions in closing, I would once again, just point out the Wang case and that if there is one reason that is supported by the record and goes to the heart of the claim, that this court should dismiss the petition or deny the petition for review. Thank you. Your Honor, she did file an I-130 petition based on marriage to a new husband. At the time she asked the court to stay the proceedings so she could complete that application, they did not do so. That petition was approved. It was approved on February 11th, 2004. And she is still married to the same American citizen so that she does have a resident visa. Is anything about that moved to this? Well, the Board of Immigration Appeals will not grant motions to reopen. They insist that you go to the district counsel's office. The district counsel in Los Angeles is extremely difficult to get a decision out of them agreeing to reopen the case. But if the case is manned back for any further hearings, so the case is still open, then she can file a new petition for relief. We have, on some of these cases, been either referring them to mediation of our court to get the government and everybody to sit down and work it out or to stay it until things are concluded. Well, there's nothing pending right now with the Board of Immigration Appeals of the Immigration Court. I'm in a mediation on an identical case. We had a mediation about two weeks ago, and the Office of Immigration and Litigation Attorney said they have no authority to agree to reopen for those purposes, and that I had to go back to the district counsel in Los Angeles and ask them to join in the motion. The district counsel in Los Angeles makes it clear that they do so only under the most extraordinary of circumstances. Sometimes we've said everybody has to come to mediation, whether they're before our court or not. I would love that. It would solve a lot of problems if there was a little more teeth in the mediation process. Could, having served at the Justice Department and in charge of ADR at the time, is there a government position now with respect to, since it was a presidential executive order I was implementing, we were implementing, is there some policy now that OIL is representing as an outside client instead of now representing itself, in effect, now that you have DHS as the client? Is there some policy, because we did just issue an order directing the DHS be part of a mediation, is there a government restriction in there that we need to be alerted to, that you could share with us? I'm not sure of an official policy on that, but the agencies are treated as clients. Right. I'm not familiar with the policy. Okay. We just want to cut through this stuff for all of us. Okay. Thank you very much. Thank you. Thank you for the extra time. The matter just argued that we submitted an extra argument and so on.
judges: B. Fletcher, Rymer, Fisher